## JEFF D. HARRIS v. STATE.

No. A-7846.  Opinion Filed April 18, 1931.
(298 Pac. 309.)

James H. Mathers, for plaintiff in error.

J. Berry King, Atty. Gen., and Edward Crossland, Asst. Atty. Gen., for the State.

DAVENPORT, P. J. The plaintiff in error, hereinafter called defendant was tried on a charge of murder and was convicted of manslaughter in the first degree and his punishment fixed at 50 years in the state penitentiary, from which judgment and sentence he appeals.

The substance of the evidence on the part of the state is as follows: The defendant, together with Snake Thomasson, a man by the name of Williams, and one by the name of Little, went to the home of James Harris about 11:30 o'clock on the 4th day of July, 1929. The evidence tends to show that Thomasson was a prohibition officer. Neither of the officers had any search warrant to search the premises of James Harris. When the officers arrived at James Harris' home, James Harris, his wife, two children, and Oscar Lowery, a brother of Mrs. Harris, were sitting on the back porch of James Harris' home. The defendant appeared in the yard of James Harris' home and without making himself known to any one as to what authority he claimed to be there, he went to a chicken coop in the yard, kicked it, and asked what it was. Oscar Lowery replied it was a chicken coop. From the coop the defendant went to the corncrib or barn of the defendant and searched through it. The testimony

further tends to shows that when the defendant went to the corncrib of James Harris and opened the door and went in, that James Harris left the porch and went into the house. That the defendant left the corncrib and came towards the house and had a pistol in his right hand. He came to the house and went in the house of James Harris by the kitchen door. Mrs. Harris followed the defendant into the house, and when she got into the house her husband was taking some shells out of a trunk. Defendant shot at James Harris with the pistol, and James Harris ran into the west room and defendant followed him. James Harris ran out of the house. The defendant followed him onto the porch. Oscar Lowery was in the yard near the porch. The defendant shot Lowery, from the effects of which he died. The testimony further shows that Lowery had no gun in his hand or about his person at the time the defendant shot him. A statement made by Oscar Lowery at about 11 a. m., on the day he died, shortly afterward, tends to show that when the defendant shot him he was unarmed and was begging him not to shoot him. After the shooting the defendant made a statement in the presence of several witnesses that the reason he went into the Harris house was that they were in there pouring out whisky. Several of the parties then went in the house and could find no evidence of any whisky having been poured out. After the defendant killed Oscar Lowery, the testimony shows that he followed James Harris northwest of the house and shot him. The defendant, testifying in his own behalf, stated that when he got to the James Harris home, the deceased and Harris' family were sitting on the porch. That he told them he was a federal officer and asked permission to look around, and that one of them told him to go ahead. He admitted he went to the chicken coop and from there to the corncrib. He states that as he left the corncrib he discovered

that the Harris family and Oscar Lowery had gone into the house. That he started to leave the place, and as he passed the house he saw the barrel of a shotgun protruding through the door. That he dodged and was shot about the face and head; James Harris shot him with a shotgun; as he returned to the porch, James Harris and Oscar Lowery both had shotguns and Lowery was trying to shoot him when he fired the shot that killed him. The defendant also introduced several character witnesses tending to show that he was a peaceable, law-abiding citizen. He also testified that when he and his associate left the Harris home, they took two shotguns with them. In rebuttal Wesley Lowery, Mrs. Frank Keiffer, and Clarence Keiffer testified that after the shooting was over Wesley Lowery came from his home, which was a short distance from the Harris home, and brought with him a single-barreled shotgun and laid it down in the yard near where he discovered his brother's body. This is in substance the testimony.

The defendant has assigned eight errors alleged to have been committed by the trial court. In defendant's brief he has only discussed three propositions. The first one is, the court erred in permitting Wesley Lowery, Mrs. Keiffer, and her son, to testify in rebuttal to the fact that Wesley Lowery brought a shotgun with him when he came down to the place where his brother was killed. Second, that the court erred in admitting the statement claimed to be the dying declaration of the deceased Oscar Lowery. Third, that the verdict of the jury is not sustained by sufficient evidence.

The evidence in this case is amply sufficient to sustain the verdict, and this judgment should be affirmed unless the other errors complained of and argued by the defendant are sufficient to warrant a reversal. Defendant

in his brief argues that the American Legion was very strong and active in the prosecution; however, from an examination of the record we fail to find any facts which justify or sustain this contention of the defendant.

The next question discussed by the defendant is error of the court in permitting testimony to be introduced in rebuttal which he insists was testimony in chief and should have been introduced in chief or not at all. An examination of the record clearly shows that the witnesses who testified in rebuttal were called for the purpose of showing that there was but one shotgun at James Harris' home at the time Oscar Lowery was killed and to rebut the statements in defendant's evidence that when the officers left the place they took with them two shotguns. The court did not err in permitting the witnesses to testify in rebuttal to the facts stated by them.

The next question argued by the defendant is the question of the admission of the statement claimed to be the dying declaration of the deceased, Oscar Lowery. The testimony of Lillian Hunt shows that she went to the hospital with Joe Reily, assistant county attorney, and she took in shorthand the questions of Mr. Reily and the answers of Oscar Lowery and transcribed her shorthand notes in typewriting, and that Exhibit No. 6 is a correct copy of the questions propounded to Mr. Lowery and Mr. Lowery's answers. The witness admitted that the statement after it was transcribed was not read to Oscar Lowery, nor was it signed by him, but she stated positively that the copy prepared by her from her shorthand notes correctly stated the questions propounded to Oscar Lowery and the answers given by him. It has been repeatedly held by this court that in order that a dying declaration may be admissible in evidence, it should be made to clearly appear that such statement was made under a well-founded

apprehension of immediate or impending death and that all hope of recovery has been abandoned. This proof may be made from what the injured person said or where from the nature and extent of his injuries it is evident that he must have known that he could not have survived. The proof in this case shows that Oscar Lowery died about three hours after the statement introduced in evidence was made, and the statement introduced as his dying declaration shows that he realized he would not get well. In Foley v. State, 11 Wyo. 464, 72 Pac. 627, 629, the Supreme Court of Wyoming in part said:

"The statements were written down by one of the physicians in attendance, and the paper was signed and sworn to by him and the other physician and one Mrs. O'Connor. It was not read over to the deceased, and was not signed by him. Under such circumstances, the writing is a mere memorandum. It may be used to refresh the memory of the witness, but is not itself evidence of the declarations of the deceased. * * * If, however, the statements contained in the paper were admissible as dying declarations, when presented to the jury by competent testimony, we are not prepared to say that the admission of the paper itself, though erroneous, was prejudicial to the defendant or reversible error. The two physicians were present as witnesses, and testified that the writing contained substantially the dying declarations of the deceased. They were competent to testify to the declarations, refreshing their recollection by reference to the writing, and the error is thus rather technical and formal than substantial or material."

Section 2822, Comp. St. 1921, is as follows:

"No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or as to error in any matter of pleading or procedure, unless, in the opinion of the court to which application is made, after

an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

The admission of the statement of deceased did not result in a miscarriage of justice or a violation of a constitutional or statutory right of the defendant. The other errors complained of are without merit.

The case is affirmed.

CHAPPELL and EDWARDS, JJ., concur.